Edward Leroy SMITH, Plaintiff–Appellant,

v.

George SUMNER; George Deeds; John Ignacio, Defendants–Appellees.

No. 88–1575.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 11, 1992.

Memorandum Filed June 30, 1992.

Memorandum Withdrawn June 1, 1993.

Decided June 1, 1993.

Kenneth James McKenna, Reno, NV, for plaintiff-appellant.

John E. Simmons, Deputy Atty. Gen., Carson City, NV, for defendants-appellees.

## ORDER

The memorandum disposition filed June 30, 1992, is withdrawn and the attached opinion, authored by Judge Hall, is filed in its stead.

Before: ALARCON, HALL and KLEINFELD, Circuit Judges.

CYNTHIA HOLCOMB HALL, Circuit Judge:

Appellant Edward Smith, a Nevada state prisoner, filed an action under 42 U.S.C. § 1983 alleging violations of his constitutional rights resulting from unreasonable restrictions on visitation, denial of his request for a privately retained attorney in a disciplinary action, denial of medical treatment, and denial of hobbycraft privileges. Smith alleges that prison officials violated his rights in retaliation for his refusal to plead guilty to a charged disciplinary infraction. After a jury trial, the district court entered judgment for Appellees on all issues.

On appeal, Smith challenges (1) the district court's refusal to give his offered instruction on right to counsel, and (2) the sufficiency of the evidence. We have jurisdiction over this timely appeal under 28 U.S.C. § 1291, and we affirm.

## I. FACTS

In May 1982, Appellant and other inmates were caught building a helicopter. Appellant was charged with unauthorized use of institutional supplies, tools and machinery (a minor violation), and possession of contraband (a major violation).[1] Appellant asked if he could hire an attorney for the disciplinary hearing. Prison officials refused, stating that prison regulations did not allow private representation, but that he could be represented by an inmate law clerk. At the disciplinary hearing, Appellant was found not guilty of the major violation and guilty of the minor violation.[2]

---

1. A "major" violation of the prison regulations is one which is also punishable under state criminal law.

2. Appellant states in his petition for rehearing following our initial decision in this appeal that the disciplinary hearing proceeded on both the minor and major violation charges, and that Appellant was found not guilty of the major charge after the hearing and deliberation were complete. In addition, in the joint pretrial order, the parties stipulated that the major charge was dismissed *after* Appellant was found not guilty. At oral argument, however, Appellant's counsel said when we questioned him about this point that the major charge was dismissed *during* the hearing. This latter statement accords with Appellees' version of events. Our decision is unaffected by this ambiguity because we reach the same result regardless of whether Appellees actually dropped the major charge, or dismissed it as a matter of procedure after finding Appellant not guilty of the major violation.

With respect to visitation, Appellant alleges that prison officials unreasonably delayed and/or denied visits from his son, daughter-in-law and mother. Appellant states that his son filed a visitation approval form in August of 1982, but that it was not approved until December of 1982. Appellant also states that his son was denied a visit on January 3, 1983, even though the visit was approved. According to Appellant, his son was also denied a visit in April 1983 because the application that was filed in February 1983 was not approved until November 1983. Even after the November 1983 approval, Appellant contends that his son was denied visits through 1986.

Appellant's son testified that he did not visit his father on January 3, 1983 because he (the son) was released from prison that day and wanted to go home. The son also testified that prison officials told him he could not visit in April 1983 because he had to wait six months after his release from prison. The son attempted to visit "a couple of times" in 1983, but could not remember why, on one of those occasions, he was not permitted to visit. The son does not recall if he filled out more than one application for visitation. Finally, the son testified that he did not visit from 1984 to 1986 because he did not have any money.

Concerning his daughter-in-law, Appellant states that four attempted visits never succeeded: one in October 1982, one in April 1983, one in August 1983, and one in September 1986. Appellant admitted on cross examination that his daughter-in-law missed the October 1982 visit because her car had broken down. Moreover, prison regulations forbid non-family members from visiting more than one inmate, and the daughter-in-law had been visiting her husband (Appellant's son). Under prison regulations, a daughter-in-law is not considered a "family member." Appellant admitted that in the application form filed in September 1982, he may not have used his daughter-in-law's correct name, and that he did not inform prison officials that she was also visiting his son.

Appellant testified that the daughter-in-law was refused a visit in April 1983 because she was still on the list as visiting her husband, even though her husband had been released three months prior to the attempted visit. Although it is unclear whether Appellant filled out the proper application forms for this visit, the daughter-in-law testified that she had not received written approval for this visit.

The daughter-in-law testified that she was denied visitation in September 1986 because she was wearing blue jeans. She received a letter approving her visits on May 27, 1983. That letter indicated that blue jeans were not permitted. A prison official testified that this policy had been in effect at the facility where the 1986 visit was to take place for at least nine months to one year prior to the September 1986 visit. The same official permitted the son to change his clothes and then enter the facility, and suggested that the daughter-in-law go to K-Mart to purchase suitable clothing. She decided against it, however, since it would be a short visit.

Appellant requested a visit from his mother in 1984, after he had been transferred to a different facility. He alleges that she was denied three visitations from 1984 to approximately 1986. Because he refused to fill out new approval forms, however, his mother was not permitted to visit. Appellant admitted that a prison official told him that if he filled out a form, his mother would be able to visit immediately. Correctional Officer Carl Swain testified that he explained the new application procedures to Appellant. Appellant admitted that he refused to sign the new forms.

The jury trial took place on November 12 and 13, 1987. In the pretrial order, the parties stipulated to several facts, including the key fact that "pursuant to the consent decree executed in conjunction with the settlement of the class action in *Craig v. Hocker*, as a matter of contract law, prisoners at the [Nevada State Prison] are entitled to the representation of an attorney for serious disciplinary infractions provided the prisoner retains such representation at his own expense." After the close of the evidence, Appellant's counsel requested a jury instruction concerning the right to counsel in prison

disciplinary hearings.[3] The request was based on the district court's ruling in *Craig v. Hocker*, 405 F.Supp. 656 (D.Nev.1975), and the subsequent consent decree settling that litigation. The district court refused to give the instruction, reasoning that there is no constitutional right to counsel in prison disciplinary hearings, and that the consent decree did not require prison officials to permit Appellant to bring in privately retained counsel. Appellant did not move for a directed verdict or judgment notwithstanding the verdict.

## II. STANDARD OF REVIEW

 A party is entitled to an instruction on his theory of the case provided that it accurately states the law and is supported by the evidence. *Los Angeles Memorial Coliseum Comm'n v. N.F.L.*, 726 F.2d 1381, 1398 (9th Cir.), *cert. denied*, 469 U.S. 990, 105 S.Ct. 397, 83 L.Ed.2d 331 (1984). This circuit has not decided whether a district court's denial of a proposed jury instruction is reviewed de novo or for an abuse of discretion. *United States v. Streit*, 962 F.2d 894, 897 (9th Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 431, 121 L.Ed.2d 352 (1992); *United States v. Zuniga*, 989 F.2d 1109 (9th Cir. 1993). It is clear, however, that failure to give an instruction on a party's theory of the case is reversible error if "the theory is legally sound and evidence in the case makes it applicable." *United States v. Scott*, 789 F.2d 795, 797 (9th Cir.1986). The particular issue confronting us in this case is whether Appellant's proposed instruction was legally sound. We will not resolve the question whether the district court's denial is subject to review de novo or for an abuse of discretion because this case does not turn on the standard we apply. Even under a more searching de novo review, we find that the district court did not err.

With respect to sufficiency of the evidence, if a party has not moved for a directed verdict, our "inquiry is limited to whether there was *any* evidence to support the jury's verdict, irrespective of its sufficiency, or whether plain error was committed which, if

not noticed, would result in a 'manifest miscarriage of justice.'" *Herrington v. Sonoma County*, 834 F.2d 1488, 1500 (9th Cir.1987) (emphasis added), *cert. denied*, 489 U.S. 1090, 109 S.Ct. 1557, 103 L.Ed.2d 860 (1989).

## III. DISCUSSION

### A. Jury Instruction

 Appellant first argues that the district court erred by refusing to give his proposed jury instruction on the right to counsel. At the close of the evidence, Appellant's counsel submitted the following jury instruction regarding the right to counsel in prison disciplinary hearings:

> Persons confined in prison have the right to due process in prison disciplinary [sic] guaranteed under the Fifth Amendment to the Constitution of the United States made applicable to the State through the Due Process Clause of the Fourteenth Amendment.

> Although the Constitution of the United States does not guarantee a person the right to representation of an attorney in a prison disciplinary hearing, this court has previously determined that prisoners confined in the Nevada State Prison are entitled to the representation of an attorney in a prison disciplinary hearing involving a violation of prison rules which may also be punishable by state authorities, provided the attorney is retained by the prisoner.

> The decision of this court that prisoners confined in the Nevada State Prison are entitled to the representation of an attorney in a prison disciplinary hearing involving a violation of prison rules which may also be punishable by state authorities, provided the prisoner retains the attorney himself, shall govern your deliberations on this issue in this case.

Appellant based the above instruction on the district court's ruling in *Craig v. Hocker*, 405 F.Supp. 656 (D.Nev.1975), and on the consent decree entered into by the parties in *Craig* as a result of settlement pending appeal. The district court rejected the instruction,

---

**3.** Because the transcript containing closing arguments and settlement of jury instructions could not be obtained, the parties entered into a stipu-

lation, which the district court approved, setting forth the events that transpired in those proceedings.

reasoning that Appellant did not have a constitutional right to counsel in a prison disciplinary hearing, and that the consent decree did not grant a right to counsel. The question we consider here is whether the district court correctly concluded that Appellant's proposed instruction lacked any legal basis.

Appellant incorrectly argues that to the extent the proposed instruction relied on *Craig*, it was a correct statement of the law. For the proposition that due process requires counsel in disciplinary hearings, the *Craig* court relied on a case that was subsequently overruled by the Supreme Court. *See Clutchette v. Procunier*, 497 F.2d 809 (9th Cir.1974), *rev'd*, *Baxter v. Palmigiano*, 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976). Therefore, the principle announced in *Craig* was no longer good law at the time of Appellant's lawsuit, and thus did not provide a legal foundation for his proposed instruction.

We must also consider, however, the more difficult question whether the consent decree provided a legal basis for Appellant's proposed jury instruction. This question requires us to determine whether the consent decree established a right to counsel protected by the Due Process Clause. We must, in other words, decide whether the consent decree created a liberty interest in retaining counsel. If it did not, then we must conclude that there was no legal foundation in this Section 1983 action for an instruction that inmates in the Nevada State Prison are entitled to hire attorneys to represent them in disciplinary hearings.

The principle is firmly established that "[p]rotected liberty interests may arise from two sources—the Due Process Clause itself and the laws of the States." *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 460, 109 S.Ct. 1904, 1908, 104 L.Ed.2d 506 (1989) (quotation omitted). Because the Supreme Court has held that inmates do not have a constitutional right to counsel in prison disciplinary hearings, *Wolff v. McDonnell*, 418 U.S. 539, 570, 94 S.Ct. 2963, 2981, 41 L.Ed.2d 935 (1974), it cannot be disputed that Appellant does not have a liberty interest in retaining counsel emanating from the Due Process Clause. However, "state law

may create enforceable liberty interests in the prison setting." *Thompson*, 490 U.S. at 461, 109 S.Ct. at 1909. In particular, prison regulations and policies can create liberty interests protected by the Fourteenth Amendment. *See Hewitt v. Helms*, 459 U.S. 460, 470–71, 103 S.Ct. 864, 870–71, 74 L.Ed.2d 675 (1983); *Mendoza v. Blodgett*, 960 F.2d 1425, 1427 (9th Cir.1992), *cert. denied*, — U.S. —, 113 S.Ct. 1005, 122 L.Ed.2d 154 (1993); *Rodi v. Ventetuolo*, 941 F.2d 22, 26 (1st Cir.1991) (in assessing whether state has created a liberty interest "the appropriate constitutional analysis looks beyond the State's statutes to administrative rules, regulations, contractual commitments, and the like"); *Long v. Norris*, 929 F.2d 1111, 1116–17 (6th Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 187, 116 L.Ed.2d 148 (1991).

■ A state law or prison regulation creates a liberty interest if it places "substantive limitations on official discretion." *Olim v. Wakinekona*, 461 U.S. 238, 249, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813 (1983). Specifically, a state creates a liberty interest by both (1) establishing " 'substantive predicates' to govern official decisionmaking," and (2) using " 'explicitly mandatory language,' " *i.e.*, specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow." *Thompson*, 490 U.S. at 462–63, 109 S.Ct. at 462–63 (citing *Hewitt*, 459 U.S. at 471–72, 103 S.Ct. at 871).

Though it is clear that prison regulations and policies can confer liberty interests, the question whether a *consent decree* can create liberty interests—provided it satisfies *Thompson*'s two-part test—is one of first impression in this court. The Supreme Court has explicitly left open this question. *Thompson*, 490 U.S. at 465 n. 5, 109 S.Ct. at 1911 n. 5; *see also Rodi*, 941 F.2d at 28 ("Here, because the consent decree required the promulgation of the regulations under the [state] APA, thereby explicitly according them the imprimatur of state law, we, too, may avoid the precise question on which the *Thompson* Court reserved decision."); *cf. DeGidio v. Pung*, 920 F.2d 525, 534 (8th Cir.1990) (a consent decree may not be di-

rectly enforced through a section 1983 action). We must decide both whether consent decrees can create liberty interests, and whether the particular consent decree at issue in this case created a liberty interest in the right to counsel, as Appellant claims.

■ Consent decrees have a dual nature, reflecting the attributes of both a contract and a judicial act. *Local Number 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 519, 106 S.Ct. 3063, 3073, 92 L.Ed.2d 405 (1986); *Kozlowski v. Coughlin*, 871 F.2d 241, 245 (2d Cir.1989); *Thompson v. Enomoto*, 915 F.2d 1383, 1388 (9th Cir.1990), *cert. denied*, —— U.S. ——, 112 S.Ct. 965, 117 L.Ed.2d 131 (1992). Though a consent decree has judicial features, it is "the parties' consent [that] animates the legal force of a consent decree." *Firefighters*, 478 U.S. at 525, 106 S.Ct. at 3077. Indeed, "the voluntary nature of a consent decree is its most fundamental characteristic." *Id.* at 521–22, 106 S.Ct. at 3075. This point is pertinent because if a consent decree were simply a judicial order issued by a federal court, it would not seem to satisfy the requirement that liberty interests arise out of either the Due Process Clause or state law. But because a state necessarily enters into a consent decree voluntarily, "typically after hard bargaining and with a full appreciation of the benefits achieved and the burdens assumed," *Rodi*, 941 F.2d at 27, any rules which a decree establishes are by any meaningful measure state-created.

■ Having concluded that a consent decree establishes state-created rights and obligations, we see no sensible way to distinguish the obligations embodied in a consent decree from those which stem from prison regulations or policies. Because a consent decree can limit the exercise of official discretion in the same manner as a prison regulation,[4] we see no reason to treat the two sources of authority differently for our purposes here. Moreover, because not only a prison regulation but also an ordinary contract or agreement directly between a state and an inmate can create protected liberty interests, *id.* at 28, we agree with the First Circuit that "it would be passing strange if a consent decree, which possesses all the attributes of an ordinary contract plus the additional element of judicial approbation, were to be accorded some inferior status." *Id.* Thus, we hold that consent decrees can create liberty interests protected by the Fourteenth Amendment.

We next consider whether the particular consent decree at issue here conferred on inmates charged with major disciplinary violations a liberty interest in retaining counsel. The consent decree provides that an inmate at the Nevada State Prison, where Appellant is incarcerated, is entitled to the representation of an attorney at hearings on serious disciplinary infractions, provided an inmate retains an attorney at his own expense.[5]

We need not look too closely at whether this provision of the decree satisfies the two-part *Thompson* test. Even if this provision creates a liberty interest under that test, the substantive interest protected could not be simply an interest in retaining counsel.[6] At most, the consent decree might create a liberty interest in not being convicted of a major violation without the assistance of retained counsel, because it is the consequences of conviction which could affect an inmate's "liberty." We reach this conclusion in light of the distinction courts have drawn between state-created procedural protections and the substantive liberty interests those procedures are meant to protect. *See Olim*, 461 U.S. at 250, 103 S.Ct. at 1748 ("Process is not an end in itself. Its constitutional purpose is to protect a substantive interest to

---

4. A consent decree, however, only creates obligations that run to the parties to the decree, and only while the decree is still in force. Regulations, on the other hand, of course apply more generally. This distinction is not significant in this case.

5. The consent decree inexplicably is not part of the record in this case, thus we can not examine its exact language. However, the parties stipulated in the Joint Pretrial Order as to the description of the decree stated in the text.

6. We understand Appellant to argue that he has a substantive interest in the right to retain counsel. He does not argue that he was entitled to notice and a hearing before the state refused his request to hire an attorney; thus, we are not faced with a question of procedural due process.

which the individual has a legitimate claim of entitlement."); *Hewitt,* 459 U.S. at 460, 103 S.Ct. at 864 (fact that state created a careful procedural structure to regulate the ·use of administrative segregation does not indicate existence of a protected liberty interest); *Harris v. McDonald,* 737 F.2d 662, 665 (7th Cir.1984) (mandatory procedural protections can not themselves be considered a liberty interest).[7]

Though a right to counsel may seem more than a simple procedural safeguard, its function for due process purposes is to protect against arbitrary or erroneous decisionmaking. *See Lassiter v. Dep't of Social Services,* 452 U.S. 18, 26–31, 101 S.Ct. 2153, 2159–61, 68 L.Ed.2d 640 (1981). Thus, even if guaranteed by language that appears to satisfy *Thompson,* the right to retain counsel conferred by the consent decree is not itself a protected liberty interest. An inmate's "liberty" surely can be affected if that inmate is convicted of a major violation without having the assistance of counsel in defending himself, but it is equally certain that an inmate's "liberty" is in no sense affected by the absence of counsel when the inmate is not convicted. *Cf. Scott v. Illinois,* 440 U.S. 367, 373–74, 99 S.Ct. 1158, 1161–62, 59 L.Ed.2d 383 (1979) (constitutional right to appointed counsel in state court criminal proceedings limited to cases where actual imprisonment is imposed).

Appellant was not convicted of the major violation with which he was initially charged; therefore, even assuming the consent decree conferred on him a due process right not to be convicted without the assistance of retained counsel, prison officials did not violate that right. Because Appellant did not have a constitutionally protected interest under the consent decree in the bare right to retain counsel, the district court did not err in refusing to give the jury the proposed right to counsel instruction.

**B. Sufficiency of the Evidence**

■ Appellant next challenges the sufficiency of the evidence to support a verdict for appellees. It is undisputed that Appellant did not move for a directed verdict. He contends, however, that his request for the jury instruction regarding right to counsel should be interpreted as a motion for a directed verdict. This argument is meritless. While it is true that "courts are more liberal about what constitutes a sufficient motion for a directed verdict," *Farley Transp. Co., Inc. v. Santa Fe Trail Transp. Co.,* 786 F.2d 1342, 1347 (9th Cir.1985), Appellant's requested jury instruction cannot be read as a motion for a directed verdict. Appellant's request dealt solely with the right to counsel and did not include language directing the jury to return a verdict in his favor. Nor did Appellant object to any of the other jury instructions on the ground that the evidence was insufficient to present the issues to the jury. Finally, Appellant did not make any motion that inartfully or ambiguously challenged the sufficiency of the evidence. *See id.*

Thus, our inquiry is limited to determining "whether there is an absolute absence of evidence to support the jury's verdict." *Id.* (quotations and citations omitted). We find that there is not an absolute absence of evidence supporting the verdict. Appellant submitted no evidence demonstrating retaliatory or intentional misconduct, or even deliberate indifference to his visitation and medical treatment rights, or his hobbycraft privileges.

■ There is evidence from which the jury could conclude that Appellant or his visitors caused the delay in visitations because they either failed to fill out the proper forms, failed to fill out the forms correctly, or failed to abide by prison regulations. With respect to Appellant's claim of retaliatory denial of medical treatment, Appellant did not offer any evidence of retaliatory conduct. Appellant testified that he had high blood pressure

---

7. We also note that the opportunity to retain counsel, by itself, is not comparable to the conditions or circumstances of confinement in which prison regulations have been held to confer liberty interests. *See e.g., Hewitt,* 459 U.S. at 470–71, 103 S.Ct. at 870–71 (liberty interest in remaining in the general prison population); *Rodi,* 941 F.2d at 28 (same); *Mendoza,* 960 F.2d at 1427 (liberty interests in administration of dry cell policy and in visitation regulations); *Long,* 929 F.2d at 1116 (liberty interest in prison visitation).

and heart trouble, but he did not demonstrate any official conduct that would constitute retaliatory denial of proper treatment. In addition, although Appellant testified that he was not permitted to use his "medical fan" after his transfer to a different facility in 1984, he admitted that he did not know the reason for the refusal. Finally, there is evidence to support the jury's verdict on the issue of retaliatory denial of hobbycraft privileges. Prison officer George Deeds testified that hobbycraft privileges were rarely granted to inmates in Appellant's unit because the fire marshal or health inspector would not allow it. Moreover, Appellant submitted only a general request, and Officer Deeds testified that an inmate must submit a "special request" to obtain hobbycraft privileges.

The judgment of the district court is AFFIRMED.